520 F.Supp. 383 (1981)
SCULLIN STEEL COMPANY, Plaintiff,
v.
NATIONAL RAILWAY UTILIZATION CORP., Defendant.
No. 80-844C(3).
United States District Court, E. D. Missouri, E. D.
March 31, 1981.
Amended April 8, 1981.
On Motion To Alter or Amend July 27, 1981.
*384 Jim J. Shoemake and John W. O'Neil, Jr., St. Louis, Mo., for plaintiff.
Veryl L. Riddle and William E. McCurdy, Jr., St. Louis, Mo., for defendant.

MEMORANDUM
FILIPPINE, District Judge.
This matter is before the Court on defendant's motion to quash service of process and to dismiss for lack of personal jurisdiction and for failure to state a claim, or in the alternative to transfer this action to the Eastern District of Pennsylvania. Both parties have submitted affidavits in support of their respective positions with respect to the motion. Taking all of the allegations of the complaint as true, except as those allegations are controverted by defendant's affidavits, and considering also all affidavits on file, the Court finds that the plaintiff has not made a sufficient prima facie showing of jurisdictional facts sufficient to withstand the defendant's motion to dismiss.
The facts disclosed by the complaint, which is in three counts, and by the affidavits, are as follows. Plaintiff, Scullin Steel Company, is a Delaware corporation with its principal place of business in St. Louis, Missouri. Defendant, National Railway Utilization Corp. (NRUC), is a South Carolina corporation with its principal place of business in Philadelphia, Pennsylvania. Plaintiff is engaged in the manufacture of steel castings used in the manufacture of railroad cars; defendant is engaged in the business of manufacturing and leasing railroad cars. Defendant is not authorized to do business in Missouri; it has no office or personnel in Missouri, owns no real property in Missouri, and does not have any agent for service of process or for any other purpose in Missouri.
In June, 1978, a period of shortage of "car sets," or side frames and bolsters, Mr. Robert Peters, plaintiff's Vice President of Sales, visited Mr. John A. Mariscotti, Executive Vice President of defendant, in Philadelphia, Pennsylvania, to discuss a contract for the sale of railroad car sets by plaintiff to defendant. On June 12, in Philadelphia, Mr. Mariscotti signed a Sales Agreement prepared by plaintiff. Two weeks later plaintiff submitted a slightly altered Sales *385 Agreement to Mr. Mariscotti in Philadelphia, which Mr. Mariscotti signed in that city on June 26, 1979. Defendant sent the executed Agreement to plaintiff in St. Louis, where plaintiff signed it. A copy of this contract is annexed to the complaint as Exhibit 1. The new Sales Agreement, which superseded the earlier one, provided that Scullin would sell 2,700 car sets to defendant in the period between January 1, 1979 and December 31, 1981 at the rate of 75 car sets per month, "F.O.B. Seller's Plant, St. Louis, Missouri."
Early in 1979, Mr. Mike Franz, a sales representative of plaintiff, called Carolyn Wilson, purchasing agent for defendant, and also visited defendant's offices in Philadelphia, to discuss a possible extension of the Sales Agreement. The parties' affidavits differ as to the degree of persuasion exercised by Mr. Franz. The details of the amendment were worked out in telephone conversations between Mr. Franz and Ms. Wilson. On April 20, 1979, in Philadelphia, Robert Shiner, Senior Vice President of Operations of defendant, signed the "Amendment to Sales Agreement" (Amendment), a copy of which is attached to the complaint as Exhibit 2. The Amendment had been drafted by Mr. Franz in accordance with his conversations with Ms. Wilson. The Amendment was signed by plaintiff in St. Louis, Missouri. The Amendment extended the period of the Agreement for an additional two years, and provided for the sale of 1,862 additional car sets. The Amendment incorporated the remaining terms of the Agreement. No employee or representative of defendant visited Missouri in negotiating or entering into these contracts or in connection with any other aspect of this action.
All manufacturing done by plaintiff under the Agreement and Amendment were done in plaintiff's only plant which is, and always has been, located in St. Louis, Missouri. The car sets were inspected by defendant on arrival in Pickens, South Carolina, and when the car sets were defective, plaintiff sent its quality control personnel to Pickens to inspect and accept the defective parts. All payments made by defendant were sent to plaintiff's office in St. Louis, Missouri; all shipments of castings to defendant were made from plaintiff's St. Louis plant.
Defendant specified certain details for the castings and plaintiff's engineering department in St. Louis prepared drawings of the castings which were sent to NRUC for approval. By letter dated August 30, 1978, addressed to plaintiff's Vice President-Engineering in St. Louis, defendant's Consulting Engineer approved the drawings submitted by plaintiff for an initial order of 2,169 car sets. Subsequent orders were handled in a similar manner. However, the car sets manufactured by plaintiff for defendant were interchangeable with respect to any railway cars having a 70-ton load capacity (approximately 70% of all rolling stock in the United States). Plaintiff decided to manufacture the ordered parts with holes for dead-lever fulcrum brackets, even though defendant had not required such holes, for the use of any possible subsequent owner. Of the 6,362 car sets which were the subject of the Agreement, as amended, approximately 87 car sets were received and put in use by defendant. The invoice price of the received car sets was $109,642.53, which defendant has refused and failed to pay. An additional number of castings, approximately 29 car sets and 199½ bolsters, were received by defendant but returned to plaintiff for credit.
During the first five months of 1980 there was a series of meetings between representatives of plaintiff and defendant at which a possible resolution of the instant claims was discussed. All of these meetings occurred in Philadelphia. A Creditors' Committee of defendant established a plan of reorganization on June 6, 1980. All of the Committee meetings have been held in Philadelphia, except for one meeting in Boston.
Service was had on defendant in Philadelphia, Pennsylvania, pursuant to the Missouri long-arm statute, § 506.500 R.S.Mo.1978. Because the Missouri Supreme Court has interpreted the reach of § 506.500 to be *386 coextensive with that of due process, State ex rel. Deere and Company v. Pinnell, 454 S.W.2d 889, 892 (Mo.1970), the question is whether defendant has had such "minimum contacts" with Missouri that maintenance of this action would be consistent with "`traditional notions of fair play and substantial justice,'" International Shoe Co. v. Washington, 326 U.S. 310, 316, 66 S.Ct. 154, 158, 90 L.Ed. 95 (1945) (citations omitted), inherent in the concept of due process. The Supreme Court elaborated upon the minimum contacts test in Hanson v. Denckla, 357 U.S. 235, 78 S.Ct. 1228, 2 L.Ed.2d 1283 (1958), stating that
[t]he unilateral activity of those who claim some relationship with a nonresident defendant cannot satisfy the requirement of contact with the forum State. The application of that rule will vary with the quality and nature of the defendant's activity, but it is essential in each case that there be some act by which the defendant purposefully avails itself of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws. [Citing International Shoe, supra.]
357 U.S. at 253, 78 S.Ct. at 1239.
Most recently, the Supreme Court has elaborated upon the "minimum contacts" test in World-Wide Volkswagen Corp. v. Woodson, 444 U.S. 286, 100 S.Ct. 559, 62 L.Ed.2d 490 (1980). In holding that an Oklahoma state court had improperly exercised jurisdiction over a New York automobile distributor and a New York retail dealer, one of whose automobiles, purchased in New York, was involved in an accident in Oklahoma, the Court stated that the "minimum contacts" requirement performs "two related, but distinguishable, functions": it protects the defendant against unreasonable burdens of litigation, and it protects the status of the states as coequal federated sovereigns. In discussing the second function, the Court stated that
[e]ven if the defendant would suffer minimal or no inconvenience from being forced to litigate before the tribunals of another State; even if the forum State has a strong interest in applying its law to the controversy; even if the forum State is the most convenient location for litigation, the Due Process Clause, acting as an instrument of interstate federalism, may sometimes act to divest the State of its power to render a valid judgment. [Citing Hanson v. Denckla, supra.]
444 U.S. at 294, 100 S.Ct. at 565.
In the instant case, plaintiff was not contractually required to manufacture the goods in St. Louis, although delivery was to be made F.O.B. Seller's Plant, St. Louis. However, the Court believes that the reasonable inference from the submitted materials is that defendant fully anticipated that the goods sold under the contract would be manufactured in St. Louis, as that was the location of plaintiff's only plant. Thus the instant case presents a factual pattern nearly identical to that of Lakeside Bridge & Steel Co. v. Mountain State Construction Co., Inc., 597 F.2d 596 (7th Cir. 1979), cert. denied 445 U.S. 907, 100 S.Ct. 1087, 63 L.Ed.2d 325 (1980). In Lakeside Bridge, the plaintiff, a Wisconsin corporation, sued the defendant, a West Virginia corporation with its principal place of business in West Virginia, on a contract for the sale by plaintiff to defendant of certain structural assemblies. Delivery of the assemblies was to be made "F.O.B. Sellers Plant Milwaukee, Wisconsin...." Defendant had no physical presence whatever in Wisconsin. The Seventh Circuit summarized the argument for personal jurisdiction over the defendant as follows: defendant
[ordered] goods from a Wisconsin company with knowledge that they were likely to be manufactured in Wisconsin and shipped from there. Also ... [defendant used] the mail and telephone to communicate with [plaintiff] in Wisconsin during the negotiation and performance of the contract, and [the purchase order at issue was allegedly accepted in Wisconsin, although in fact defendant received and tacitly approved a modified purchase order in West Virginia.]
597 F.2d at 600.
The Seventh Circuit held that, because only the contractual obligations of the plaintiff were performed in Wisconsin, the contract did not require performance in *387 Wisconsin, and there was no showing that the defendant had had any other dealings with the State of Wisconsin, the situation was one of "unilateral activity of [one] who claim[s] some relationship with a nonresident defendant," Hanson v. Denckla, supra, 357 U.S. at 253, 78 S.Ct. at 1239, which was insufficient to support personal jurisdiction. However, the Court said in a footnote that it was expressing no opinion, on whether the result would differ "if the contract required the plaintiff to perform in the forum state or if the nature of plaintiff's contractual obligations made performance in the forum state necessary." 597 F.2d at 603 n.13. It is not apparent whether the plaintiff in Lakeside Bridge had plants outside Wisconsin at which it could have chosen to manufacture the contract goods.
The Seventh Circuit noted in Lakeside Bridge & Steel that the Eighth Circuit had apparently reached a contrary conclusion on the sufficiency of unilateral performance in the forum state in Electro-Craft Corp. v. Maxwell Electronics Corp., 417 F.2d 365 (8th Cir. 1969). Electro-Craft involved a contract between a nonresident seller-manufacturer and a resident buyer. The contract had been accepted in Texas, where the nonresident seller was located. The nonresident seller had no physical presence of any kind in Minnesota, the forum State, and the transaction at issue was the only one between the parties. On appeal from the District Court's denial of the defendant's motion to dismiss an action brought by the Minnesota buyer in Minnesota, the Eighth Circuit affirmed, holding first that the service had on defendant in Texas was authorized under the Minnesota long-arm statute, and second, that the exercise of jurisdiction did not violate defendant's due process rights. The Court noted in discussing the "minimum contact requirements" of the Minnesota Supreme Court, (requirements which the Eighth Circuit indicated "closely parallel[ed]" those of due process, 417 F.2d at 367 n.6), that the Minnesota courts had drawn a distinction between service on a nonresident seller and a nonresident buyer.
In Aaron Ferer & Sons Co. v. Diversified Metals Corp., 564 F.2d 1211 (8th Cir. 1977) the Court noted in discussing the due process issue raised by a motion to dismiss for lack of personal jurisdiction that
[s]ome jurisdictions have made a distinction between contacts initiated by a seller and contacts initiated by a buyer from outside the state. In these cases, the courts have held that the solicitation by a nonresident purchaser for delivery outside the forum state is a more minimal contact than that of a seller soliciting the right to ship goods into the forum state. This distinction was held to be controlling in Electro-Craft, [supra].[1]
Thus the Eighth Circuit has interpreted Electro-Craft to mean only that unilateral contact by a resident buyer with the forum state may be sufficient to sustain personal jurisdiction over the nonresident seller. However, in Aaron Ferer & Sons Co. v. Diversified Metals Corp., supra, the Eighth Circuit eschewed the use of the buyer/seller distinction, stating that the "ultimate test is whether the defendant, either as seller or buyer, has performed `some act by which [it has] purposefully [availed] itself of the privilege of conducting activities within the forum state....'" [Citing Hanson v. Denckla, supra.] 564 F.2d at 1215. The Court considered five factors in Aaron Ferer & Sons Co. in determining that the nonresident buyer's contacts with Nebraska had been insufficient to sustain personal jurisdiction there. The nonresident purchaser had contacted the resident broker by phone and by mail, and the resident broker either had arranged for shipment from a nonresident supplier or, in a few instances, had *388 shipped the goods from its own Omaha plant. There was no proof that the buyer ever performed any acts in Nebraska related to the contracts or designated that shipment was to originate in Nebraska. The Court held that such contacts were insufficient.
This Court is not unaware of the obvious distinction between Aaron Ferer, supra, and M & D Enterprises, Inc., supra, on the one hand, and the instant case on the other hand. Performance by the resident plaintiff, and hence significant economic consequences, were virtually certain to occur in Missouri as a result of the contracts at issue in the instant case. To hold that personal jurisdiction is not supportable in such circumstances although it would have been supportable if, for example, representatives of defendant had made two isolated trips to the forum state in connection with the contract, see, e. g., Wisconsin Electrical Manufacturing Co., Inc. v. Pennant Products, Inc., 619 F.2d 676 (7th Cir. 1980), is to come very close, in this Court's view, to holding that "`the law's requirement is satisfied by a footfall on the State's soil,' (citation omitted)," id. at 678 n.8. It is in fact difficult to perceive how a nonresident corporation has any more "purposefully avail[ed] itself of the privilege of conducting activities within the forum State," Hanson v. Denckla, supra, 357 U.S. at 235, 78 S.Ct. at 1228, simply because its representative has made an actual appearance in the state on one or two occasions, rather than negotiate by phone or mail, in furtherance of a contract which causes activity of the resident manufacturer in the forum state.
Nonetheless, the Court is constrained to find, after consideration especially of the evidence of two of the "primary factors" in the test for personal jurisdictionthe nature, quality and quantity of defendant's contacts with Missouri[2]  Aaron Ferer & Sons Co. v. Atlas Scrap Iron, 558 F.2d 450, 456 n.10 (8th Cir. 1977) that those contacts are insufficient to support personal jurisdiction. Accordingly, defendant's motion to dismiss for lack of personal jurisdiction will be granted as to Counts I and II of the complaint, which sound in contract.
The Court further finds that Count III, which attempts to state a claim for breach of an implied covenant to deal fairly with plaintiff, fails to state a claim against defendant on which relief can be granted. Defendant's alleged rejection of plaintiff's settlement proposals does not fall within that class of actions, involving third-party insurance, in which a claim of bad faith failure to settle is actionable under Missouri law. See, e. g., Rossman v. G.F.C. Corp., 596 S.W.2d 469 (Mo.App.1980); Dyer v. General American Life Ins. Co., 541 S.W.2d 702 (Mo.App.1976). Nor has the plaintiff cited any case which would support the proposition that defendant's alleged failure to abide by the implied covenant to deal fairly or to accept plaintiff's settlement proposals is actionable under the circumstances alleged. Accordingly, Count III will be dismissed for failure to state a claim.

MEMORANDUM AND ORDER

ON MOTION TO ALTER OR AMEND
This matter is before the Court on plaintiff's motion to alter or amend judgment. The Court will abide by its decision to dismiss Counts I and II for lack of personal jurisdiction. However, the Court finds that plaintiff is correct in arguing that Count III, as to which there were no more contacts by defendant with the State of Missouri than there were as to Counts I and II, should also have been dismissed for lack of personal jurisdiction, rather than for failure to state a claim. Arrowsmith v. United Press International, 320 F.2d 219 (2d Cir. 1963); 5 Wright & Miller, Federal Practice and Procedure § 1351 at 563 (1969). In this case, the issue of jurisdiction is not dependent on the merits of the claim, and the cases cited by defendant are therefore inapplicable.
Accordingly,
IT IS HEREBY ORDERED that plaintiff's motion to alter or amend judgment be *389 and is GRANTED in part and DENIED in part.
IT IS FURTHER ORDERED that plaintiff's motion be and is GRANTED as to the ground of dismissal for Count III, and otherwise DENIED.
IT IS FURTHER ORDERED that the third paragraph of this Court's order of March 31, 1981, be and is amended to read as follows:
IT IS HEREBY ORDERED that defendant's motion to dismiss this action for lack of personal jurisdiction be and is GRANTED, and that defendant's motion to dismiss Count III for failure to state a claim, and defendant's alternative motion to transfer, be and are DENIED as moot.
IT IS FURTHER ORDERED that the Memorandum entered on March 31, 1981, be and is amended by vacating the last paragraph above the date line on page 10, and by amending the last sentence thus remaining in the Memorandum to read as follows: "Accordingly, defendant's motion to dismiss this action for lack of personal jurisdiction will be granted, and defendant's remaining motions will be denied as moot."
NOTES
[1] The same distinction was implied in M & D Enterprises, Inc. v. Fournie, 600 S.W.2d 64 (Mo.App.1980), in which the Court held that a nonresident purchaser of goods could not be sued in Missouri courts when the purchaser's only contacts with Missouri had been the calling of telephone orders into Missouri and the sending of payment there. The Court stated that

[t]o permit Missouri courts to have jurisdiction in this case would amount to an open invitation to Missouri residents to go into other states, solicit business as an aggressor, and then, as a practical defense to any claim asserted by a nonresident buyer ... drag the buyer into Missouri courts ....
600 S.W.2d at 69.
[2] There is no showing, by affidavit or by allegation of the complaint, that the defendant has ever had any other contacts with the State of Missouri than those at issue here.